UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RAMI IKBAL SABA,

    Defendant.
_____/

Case No. 1:08-cr-68

HON. JANET T. NEFF

# OPINION

    Close legal decision-making by trial judges almost always involves balancing competing interests. This is nowhere more true than in a complex criminal case involving the loss of human life. Achieving balance to preserve the rights of the accused, to protect the public and to serve justice is the challenge that drives the criminal justice system. Without the proper balance, the scales of justice are nothing more than a meaningless symbol.

    This case has presented unusual challenges in achieving balance almost from the outset. The issue now ripe for decision is defendant's motion to proceed with his case unrepresented by counsel, and fully aware of the dangers inherent in that course of action. The Motion is GRANTED based on my consideration of the interests served, and ultimately resting soundly on fundamental principles of criminal law and a defendant's constitutional right to make his own defense in the face of charges by the government.

    Defendant's motion to proceed *pro se* brings into clear focus the important distinction between a defendant's competency to stand trial and competency to conduct his own defense, as

recently set forth by the United States Supreme Court in *Indiana v. Edwards*, 554 U.S. 164 (2008), in which the Court acknowledged that the issue of competency to forgo counsel at trial presents a very different set of circumstances, calling for a standard different from simply the standard governing competency to stand trial. *Id.* at 174-75. "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky*[1] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178.

The *Edwards* Court, having unequivocally announced a higher standard for self-representation competency, did not articulate any standard to be applied in deciding competency to self-represent. The Court observed that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177. The Court concluded that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id.* at 177-78. The skeletal guidance of *Edwards* suggests that a case-by-case analysis is to be employed requiring, a review of the specifics of this case.

## I. Background

This case has been pending since December 2007 and, in that time, has developed a lengthy and complicated history. The case began with a criminal complaint filed against defendant Rami Ikbal Saba charging him with mail fraud, 18 U.S.C. § 1341; bank fraud, 18 U.S.C. § 1344; and aggravated identity theft, 18 U.S.C. § 1028A (Dkts 1, 4, 9 ¶ 1), related to the disappearance of

---

[1]*Dusky v. United States,* 362 U.S. 402 (1960).

Saranac, Michigan, resident Donald Dietz. As the case continued, it evolved into a capital murder case against defendant and a codefendant, Raogo Ouedraogo—a case in which there is no body, no weapon, no confession, and apparently no physical evidence of a homicide. Certification of the death penalty has been denied by the United States Attorney General with respect to two charged capital offenses in the current twelve-count, third-superseding indictment (now referred to simply as the "indictment" for ease of reference) (*see* Dkt 254), leaving each defendant subject to life imprisonment without parole if convicted. Defendant Saba's *pro se* motion to terminate representation by his appointed counsel and represent himself at trial (Dkt 286) has been the subject of hearings by the magistrate judge and this Court leading to this opinion and order.

Both the government and the defense have previously moved for *trial competency* determinations in this case, each involving different underlying concerns. In both instances, once in December 2007 by the magistrate judge and again in August 2010 by this Court, defendant has been found competent to stand trial. In neither instance was there any examination or determination beyond that necessary to decide that defendant was competent to stand trial within the meaning and minimal standards of 18 U.S.C. § 4241(d), i.e., that he was capable of understanding the nature and consequences of the proceedings against him and of properly assisting counsel in his defense.

*Previous Competency Determinations*

Before the return of the original indictment, the government moved for a forensic competency and mental evaluation of defendant (Dkt 9) based on a letter written by defendant, discovered during the execution of a search warrant at defendant's home. The letter, written to defendant's wife, raised a legitimate concern that defendant may be suicidal under the mounting stress of his financial circumstances and the pending criminal charges. The magistrate judge denied

the government's motion without prejudice but ordered that defendant undergo a psychological examination to determine whether he was suicidal and whether psychological counseling or treatment should be part of his pretrial release conditions. A psychological evaluation was conducted on December 27, 2007, resulting in the conclusion that defendant was not suicidal, that he was not mentally ill and was a high functioning individual (Dkt 316 at 6-7). Defendant was found to be "without question competent to stand trial," "able to understand the charges he is facing and able to assist in his own defense" *id.* at 7).

Defendant was released on bond in 2007. Over the following two years, while on bond, defendant underwent counseling for issues related to stress and depression; he sustained serious injuries in two car accidents; and he suffered repeated medical and emotional/mental crises requiring hospitalization and psychiatric treatment.

In March 2009, defendant was arrested and held in the Ionia County, Michigan jail on charges of perjury stemming from the state's investigation of Dietz's disappearance (Dkt 351 at 7). After the state declined to pursue a murder case, the government determined that it would pursue the murder charges in the federal case, and in September 2009, a third superseding indictment was returned, charging two capital offenses in addition to ten counts of conspiracy to commit bank fraud, attempted financial institution fraud, aggravated identity theft, and conspiracy to commit kidnapping (Dkt 179).

As the case progressed through the lengthy death penalty certification process in the Department of Justice, defense counsel became increasingly concerned about defendant's mental

4

health status, particularly in light of his mid-2009 conversion to Islam and his strenuous invocation of Islamic religious precepts to guide his defense. Defendant's preoccupation with Islamic religious principles became an increasing source of conflict with his defense counsel.

In April 2010, defense counsel filed a motion for a determination of defendant's competency to stand trial (Dkt 273) after defendant wrote a lengthy letter to defense counsel that again raised concerns about his mental health. The Court granted the defense motion and ordered that defendant be committed to the custody of the Attorney General for an expedited psychological evaluation to determine his competency to stand trial. *See* 18 U.S.C. §§ 4241(b). Following psychological testing and evaluation by the Fort Worth, Texas, Federal Correctional Institute forensic staff, Randall Rattan, Ph.D., ABPP, prepared a 15-page report, opining that "defendant did not appear to suffer from a mental disease rendering him unable to understand the nature and consequences of the proceedings against him or to properly assist in his defense" (Dkt 294 at 14). Dr. Rattan qualified his competency determination, however, given defendant's lack of cooperation in the evaluation and his preoccupation with the Islamic religion, stating:

1. "In light of the defendant's limited participation in this psychological evaluation, and due to the nature of the current charges, it is recommended that all psychological assessment and treatment records be reviewed should concerns regarding competency remain."

2. "The defendant's full participation in a psychometric assessments is highly encouraged in order to assess current psychological functioning should further evaluation [be] warranted."

3. "The defendant is recommended to be interviewed by a person familiar with Islam to further rule out possible sources of mental health symptoms that could affect case related decision making."

*Id.* at 14-15. On August 26, 2010, the Court conducted a hearing on the matter of defendant's competency to stand trial. Based on the written evaluation report and opinion of Dr. Rattan, and

after hearing testimony from Dr. Rattan and defendant, the Court rendered a decision from the bench, finding defendant competent to stand trial (*see* Dkts 319, 321).

In the midst of the resolution of the motion for determination of his competency to stand trial, on July 13, 2010, just prior to the filing of the report by Dr. Rattan, defendant filed a *pro se* "notice to terminate his attorneys and appearance in pro per" (Dkt 286). Shortly after, on July 20, 2010, defendant filed a supplement to his *pro se* motion to terminate his representation by counsel (Dkt 292). Defendant thereafter submitted two supplemental *pro se* briefs on the matter of self-representation (Dkts 334, 343). The Court referred defendant's motion for self-representation to Magistrate Judge Ellen S. Carmody, who held a hearing on September 3 and 7, 2010. Over the course of the past several months, defendant has continued to submit lengthy, handwritten *pro se* missives, letters and motions to the Court, despite his continued representation by counsel.

On September 8, 2010, Magistrate Judge Carmody issued a Report and Recommendation, recommending that defendant's motion to proceed *pro se* be granted (Dkt 344). On September 16, 2010, counsel for defendant filed timely objections to the Report and Recommendation (Dkt 351). On October 14, 2010, the Court conducted a supplemental hearing on this matter in which it had the opportunity to personally question defendant about his request to represent himself. After reviewing the entire record and hearing testimony from defendant, the Court concluded that it was unable to determine defendant's competency to conduct his own defense, as contemplated by *Edwards*, 554 U.S. at 176-78, without further specialized psychiatric evaluation, particularly given the lengthy and contradictory history of defendant's mental health status during the course of this case. Of more specific concern to the Court was the 2008 diagnosis of delusional disorder, which only belatedly came to light in the hearings on self-representation and had not been given formal consideration in

6

the competency determination by Dr. Rattan. Defendant's mental health history and his most recent continuing *pro se* submissions, made it clear that this case involved "a mental condition that [fell] in a gray area between *Dusky's* minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose." *Id.* at 172.

The record and findings to date were simply inadequate for the Court to make the more refined determination necessary to decide defendant's competency to conduct his own defense. The history and circumstances of this case, combined with the lack of specific standards in *Edwards* and ensuing case law for assessing self-representational competency, made that determination a precarious task, which could not reasonably or reliably be made by the Court in lay terms. The self-representation competency issue only made an already complex case even more difficult in efforts by the Court and counsel to adhere to the most fundamental principles of justice—that is, to protect defendant's constitutional right to a fair trial and his right to conduct his own defense, while ensuring the integrity of the judicial proceedings and a reliable outcome. Accordingly, the Court determined that a forensic psychiatric evaluation was necessary to determine whether defendant "lacks the mental capacity to conduct his trial defense unless represented." *Id.* at 174.

On October 18, 2010, the Court ordered that defendant be evaluated by Debra A. Pinals, M.D., a board certified forensic psychiatrist, to determine his mental competency to conduct his own defense and trial proceedings. The Court sought, and I am confident, found, a psychiatric professional with the specialized expertise necessary to fully, thoroughly review the lengthy history of this case and assist the Court in making a fully-informed and independent competency determination pursuant to the limited guidance of *Edwards*. The Court retained Dr. Pinals to

7

conduct an evaluation of defendant and prepare a report outlining her findings, to specifically include whether defendant suffers from any mental incapacity that would impair his ability to conduct his own trial defense (Dkts 366, 407). The Court ordered that defendant's motion to proceed *pro se* be held in abeyance pending completion of that evaluation, and that appointed counsel remain counsel of record during the pendency of his motion (Dkt 366).

## II. Current Status

Dr. Pinals has now completed her evaluation and provided the Court with her conclusions and opinions in a comprehensive, detailed 32-page Psychiatric Evaluation of Competence to Waive Right to an Attorney and Competence to Proceed *Pro Se* (Dkt 414). In conducting her evaluation, Dr. Pinals interviewed a number of individuals personally or by telephone, including defendant's wife; defense counsel; government counsel; staff from the Newaygo County Jail where defendant is currently held; previous treatment providers, Bill VanWoerkom and Joan VanSolkema; and Dr. Randall Rattan, who conducted the previous psychological evaluation of defendant. Dr. Pinals interviewed defendant twice for a total of approximately 11 hours and 20 minutes. She also considered psychological testing results from Donna Kelland, Ph.D., who was retained in November 2010 to conduct psychological and neuropsychological testing and assessment of defendant at Dr. Pinals' request (Dkts 391, 413). Additionally, Dr. Pinals reviewed voluminous case records and other documents provided by counsel, the Court and other outside sources.

Although in the past it has been necessary to hear testimony from the examining professional at a competency hearing, as with Dr. Rattan, Dr. Pinals' testimony was unnecessary in light of the nature and extent of her review, evaluation and written report. The evaluation process, and Dr. Pinals' expert assistance and insights have been an invaluable aid to the Court in carrying out its

8

responsibilities under *Edwards*.

As discussed above, Dr. Pinals' report is comprehensive and detailed. It addresses and resolves to the Court's satisfaction every concern advanced in this case with respect to the question of defendant's mental competency. Of particular importance, the report is unequivocal in its concluding opinions.

First and foremost, with regard to defendant's mental health conditions and diagnosis, it is Dr. Pinals' opinion that "to a reasonable [] degree of medical certainty and based on the data currently available, Dr. Saba does not currently present with the signs or symptoms of a major mental illness or mental defect" (Dkt 414 at 27). Her diagnosis noted a "History of Major Depressive Disorder, Single Episode, with Psychotic Features" which is "currently in full remission." (*id*.) The diagnosis states a Global Assessment of Functioning score of 75. (*id.*)

One of the primary questions in this case regarding self-representation competency was defendant's previous diagnosis of delusional disorder, which Dr. Pinals directly addressed and resolved, stating:

> One of the challenges in looking at the old records was that it appeared that Dr. Saba was not fully forthcoming to psychiatric consultants about his history, so some of the diagnostic thread of a Delusional Disorder, Jealous Type appears to have been carried over based on Mr. Van Woerkom's original diagnostic impression. However, in my opinion, the progression and resolution of Dr. Saba's symptoms is inconsistent with that diagnosis. Mr. Van Woerkom eventually recorded a treatment exit diagnosis of Depressive Disorder, Not Otherwise Specified and Anxiety Disorder, Not Otherwise Specified, with a question of a Delusional Disorder. Both Mr. Van Woerkom and Ms. Van Solkema indicated that in retrospect, a diagnosis of Major Depressive Disorder with Psychotic Features seemed more accurate based on Dr. Saba's presentation at the time.

*Id*. at 28.

Dr. Pinals concludes that the psychotic symptoms ultimately resolved. Thus, the previous diagnosis of delusional disordered is not an impediment to self-representation at this time.

An additional concern regarding defendant's self-representation competency was his preoccupation with the Islamic religion, to which he had recently converted, and the conflicts presented with respect to his defense. Dr. Pinals concludes that, in her opinion, defendant's "religious views do not appear to be disproportionate or indicative of a mental illness." (*Id.* at 29) She additionally states that "his religious views did not appear to be associated with a fluctuating mood state such as manic symptoms (e.g., periods of excessive energy, racing thoughts, a sense of self-importance that can become extreme and bizarre) (*id.*). Instead, his religious views seem to take on a philosophical stance to help him cope" (*id.*). In light of Dr. Pinals opinion, it is the Court's view that defendant's religious views are not, per se, an impediment to self-representation.[2]

Following her opinions related to defendant's mental health conditions and diagnosis, Dr. Pinals stated her separate opinions regarding defendant's competence to waive his right to counsel and competence to proceed *pro se* at this time, which follow verbatim:

**Opinion Relevant to Competence to Waive Right to Counsel**

In my opinion, Dr. Saba appears to have capacities relevant to make a knowing, intelligent, and voluntary decision to waive counsel. He stated clearly that although he is following his faith, he believes that he is making his own choice in waiving his right to counsel and in deciding to represent himself. Dr. Saba has been advised against his choice by members of his family as well as the defense and the judge. He has nonetheless expressed his preference based on personal values. For example, though he states that Allah is steering his choices, he also articulated that he recognized that this decision was an option that he chose to make in accordance with what he thought was right for himself and his beliefs.

---

[2]However, as the Court has warned defendant previously, the Court will enforce appropriate limitations restricting defendant from calling attention to his religious beliefs or practices during trial.

10

In my opinion, Dr. Saba appears to be electing, with full knowledge that he may not legally prevail, to represent himself as the best way he can feel that he has control over how the evidence against him is challenged. He was able to articulate the role of an attorney in the American legal system. He focused on the legal system being corrupt in its approaches, but also recognized that this is the system in which his charges will be tried. He is aware of the potential penalties he faces, and of his limited experience and knowledge of the technical aspects of the law. He indicated, however, that he will be relying on his faith and will accept whatever outcome results. His views about his religion and his choice to waive counsel do not, in my opinion, appear to be based on a mental illness.

**Opinion Relevant to Competence to Proceed *Pro Se***

Given the lack of a clear legal standard as guidance, a clinical opinion regarding Dr. Saba's capacity for self-representation is more complex. Nevertheless, in making its determination, the Court may wish to consider the following. In my opinion, as noted above, Dr. Saba does not currently present with the signs or symptoms of a serious mental illness or mental defect. In my opinion, he manifests personality traits, particularly paranoid, but also obsessive-compulsive and narcissistic types. When stressed these traits can be more pronounced and create interpersonal challenges.

With regard to his competence to represent himself, in my opinion, despite some relative weakness related to his personality style, Dr. Saba exhibits several strengths that may be relevant to being a *pro se* defendant. He is generally of average to high average intelligence, he appears motivated to defend himself to achieve the best outcome for himself (which would include, in his mind, showing where there are truths and lies in the case even if he did not prevail). Dr. Saba's personality traits may assist him in terms of a heightened vigilance and tendency to scrutinize in detail the motivation of others and the evidence against him. As a criminal defendant, his need to do so is logical and in my opinion, rational. He has an ability to speak and communicate coherently and relevantly, without distortion due to mental illness.

Dr. Saba appears able to articulate a defense strategy and his readiness to attempt it. He emphasized the desire to sort out the circumstantial nature of much of the evidence and challenge witnesses directly. His attorney of record, Ms. Turek, indicated that his strategy did not appear irrational, though she viewed it as possibly not the best legal approach in typical cases. Dr. Saba has an ability to research the law and learn about legal proceedings. He appears to have a realistic appreciation of some of the prejudice he may be facing as a Lebanese national. He has demonstrated the ability to file motions on his behalf that, although overly detailed and at times inclusive of information that may seem off point, convey logical goals for what he considers in his best interest and do not appear irrational. He indicated he would

avail himself of some technical assistance from stand-by counsel if he needed. He recognized that he is not allowed to invoke Allah and said he would only do so in an inaudible manner. His desire to show Allah's glory in the outcome of his case appears more of a way to symbolize his faith if he were found innocent than as a manifestation of a desire to disrupt the legal process. His invocation of Allah anyway does not appear related to mental illness.

Though he has several capacities and strengths, Dr. Saba's personality traits may present challenges for him with regard to certain aspects of a *pro se* defense. If he were to proceed with self-representation, the Court may observe his rigidity and distrust as he tends toward over-emphasizing what he views as negative aspects of the legal proceedings and the motives of others. This is complicated given that many of his concerns are realistic in light of the ardent prosecution he is facing. Despite his need and desire to find his way out of the legal situation, his tendency may be to shut down avenues of reason (e.g., denial of evidence, focus on fabrication of less relevant details related to the evidence or focus related to what he views as "immoral" means the prosecution used to obtain evidence) that could at times interfere with his ability to balance legal strategies that may be in his best legal interest. These tendencies, however, are not universal or consistent and may be emphasized or de-emphasized depending on how strongly he feels about the matter at hand in a given moment and appear to be of his own choosing. He showed across my interviews, that he can back down from some of his more rigidly held beliefs and explain in a logical manner his position. Without the Qur'an in hand, for example, he was able to converse without turning to its citations. He invoked Allah primarily when I or others disagreed or challenged his assertions. He demonstrates some circumstantial speech and thoughts (excessively detailed full of extraneous information to get to the point) and can become frustrated and irritable when challenged or interrupted. He also showed a somewhat slowed processing speed (for someone with his other relative intellectual strengths) as noted in testing. However, in my opinion, these weaknesses do not have a basis in serious mental illness or defect and may be no more problematic than a wide variety of personality and cognitive styles seen with other defendants who represent themselves.

*Id.* at 30-32.

In light of Dr. Pinals' insights and opinions, defendant's request to proceed *pro se* must be GRANTED. The United States Supreme Court's decision in *Faretta v. California,* 422 U.S. 806 (1975), left no doubt that the right of self-representation is a fundamental constitutional right. The Sixth Amendment grants to an accused personally the right to make his defense, "for it is he who suffers the consequences if the defense fails." *Id.* at 819-20. That right is abridged only under the

most limited circumstances. *Edwards*, 554 U.S. at 171. A Court "may terminate self-representation by a defendant who deliberately engages in serious obstructionist misconduct." *Faretta,* 422 U.S. at 834 n.46. Standby counsel may be appointed, even over the defendant's objection, "to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Id.* Nonetheless, absent such circumstances or mental incompetency, the denial of the right to self-representation is structural error. *McKaskle v. Wiggins,* 465 U.S. 168, 177 n.8 (1984); *Rosencrantz v. Lafler,* 568 F.3d 577, 589 (6th Cir. 2009).

In *Edwards,* the Court adopted no specific standards for determining whether a defendant is competent to represent himself. The Court merely permitted that line to be drawn somewhere beyond the *Dusky* standard for competency to stand trial, given the different mental capacities needed to proceed to trial without counsel. *Edwards*, 554 U.S. at 177. The Court observed that competence to assist counsel differed from decisional competence necessary to undertake trial tasks such as organization of a defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury. *Id.* at 176. The Court further observed that mental illness is not a unitary concept, but instead varies in degree and over time. *Id*. at 175. Ultimately, however, the Court concluded that the task of deciding whether a defendant was competent to conduct his own defense was left to the trial judge, who must "take [a] realistic account of the particular defendant's mental capacities." *Id.* at 177-78.

In this case, the determination whether defendant was entitled to proceed *pro se* appeared to be a close and difficult determination and one which could not conceivably, with any reliability, be made in the absence of the specialized psychiatric evaluation undertaken. Given Dr. Pinals'

13

unequivocal opinions, and the Court's extensive review of defendant's mental capacities and conduct in this case, the Court concludes that defendant is capable of and entitled to conduct his own defense and trial proceedings. The circumstances presently presented do not warrant a mental-illness-related limitation on defendant's right of self representation. *See Edwards,* 554 U.S. at 171.

That being said, the Court reserves the right to revisit this decision if the need arises. There is no question that defendant's medical and mental health history, as self-admitted, is subject to change. This case is a prime example of *Edwards*' recognition that "[m]ental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Id.* at 175. In this regard, Dr. Pinals' concluding opinions are qualified by her acknowledgment that the stress of trial may have a negative impact on defendant's mental health. Dr. Pinals remains at the Court's disposal to assist in further evaluation if indicated by defendant's conduct as this case proceeds to and through trial.

### III. Trial Preparation

Having determined that defendant is competent to conduct his own defense in this case, it is my responsibility as the trial judge, to the extent of my ability, to ensure that these proceedings are fair in result and appearance, *see Edwards,* 554 U.S. at 177, and I fully intend to carry out that responsibility—with the continued able assistance of counsel, others involved in this case, and defendant's cooperation.

I have previously, repeatedly advised defendant, as did Magistrate Judge Carmody, that in my view he makes an extremely unwise choice to proceed unrepresented by counsel. At the hearing on this matter on January 13, 2011, defendant acknowledged that he was previously advised of the dangers of self-representation and given the opportunity to reconsider his choice. He was clear and

unequivocal in his decision to proceed *pro se*.

For the reasons articulated in *McKaskle,* 465 U.S. 168, and fully within the Court's discretion, defense attorneys Sharon Turek and David Kaczor were appointed as standby counsel. Defendant was given the opportunity to object to the appointment of standby counsel, and he articulated that he had no objection.

The performance of Ms. Turek and Mr. Kaczor in defending defendant to this point has been beyond reproach. The Court has had the benefit of closely monitoring this case over the past two years and is left with no doubt that they have worked diligently and tirelessly on defendant's behalf and in what they perceive to be in his best interests. Both are experienced, able counsel. Although defendant has now taken responsibility for his own defense, they will be responsible for ensuring that defendant has the necessary and appropriate information and assistance available to effectively proceed to trial in this matter. Standby counsel will be ordered to receive defendant's *pro se* submissions and properly present and file them with the Court. Standby counsel will also be ordered to timely advise the Court of any procedural or other impediments to the case progress and trial as scheduled. The Government will continue to serve pleadings on standby counsel, who will make them available to defendant.


DATED: January 18, 2011                     /s/ Janet T. Neff
                                            JANET T. NEFF
                                            United States District Judge